# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

3:26cv-0331

RECEIVED

MAR 2 0 2026

US DISTRICT COURT
MID DIST TENN

**LUKE ARMONDO PENCE,**
also known as LUCAS A. PENCE,
Plaintiff,

v.

**TENNESSEE DEPARTMENT OF CHILDREN'S SERVICES;**
**SUMNER COUNTY DEPARTMENT OF HUMAN SERVICES;**
**YOUTH OPPORTUNITIES OF TENNESSEE, INC. (YOITN);**
**CROCKETT ACADEMY / CUMBERLAND HOUSE;**
**MIDDLE TENNESSEE MENTAL HEALTH INSTITUTE (MTMHI);**
**TENNESSEE DEPARTMENT OF MENTAL HEALTH AND SUBSTANCE ABUSE**
**SERVICES;**
**COVENANT HEALTH / PENINSULA HOSPITAL ADOLESCENT PROGRAM;**
**WOODLAND HILLS YOUTH DEVELOPMENT CENTER;**
**CEDAR GROVE RESIDENTIAL TREATMENT PROGRAM;**
**DEDE WALLACE CENTER;**
**JOHN AND JANE DOES 1-85,**
Defendants.

Civil Action No.: _____

JURY TRIAL DEMANDED

## COMPLAINT FOR VIOLATIONS OF CIVIL RIGHTS, CONSTITUTIONAL DEPRIVATIONS, NEGLIGENCE, AND RELATED CLAIMS
(42 U.S.C. § 1983; ADA Title II; IDEA; State Law Claims)

## PART 1 — INTRODUCTION

1. This is a civil rights action brought by Luke Armondo Pence, also known as Lucas A. Pence, for the catastrophic, lifelong harm inflicted upon him by the State of Tennessee and its

contractors while he was a child entirely dependent on the State for his safety, education, and care.

2. From approximately 1992 to 2001, between the ages of nine and eighteen, Plaintiff was wrongfully removed from a loving, stable, married household and cycled through a series of state-run and contractor-operated institutions where he endured: state-enabled sexual coercion; physical injury from unsafe conditions; false behavioral labeling; punitive confinement; placement with adjudicated offenders; educational deprivation; and a complete failure to prepare him for adult life.

3. The State of Tennessee and its contractors then destroyed all records of Plaintiff's nine years in custody — eliminating the very evidence that would document what was done to him, what facilities held him, what staff supervised him, and what injuries he sustained.

4. The destruction of those records was not an accident. It was the final act in a pattern of concealment that began with a falsified incident report at Crockett Academy and ended with a records director informing Plaintiff in writing that everything was gone.

5. Plaintiff does not bring this action lightly, and he does not bring it for a nominal settlement. He brings it because the only language institutional power understands is accountability — real, documented, public accountability — and because no child who comes after him should endure what he endured in silence.

6. Plaintiff seeks $75,000,000 in compensatory and punitive damages, a trial by jury, and a public reckoning for what was done.

## PART 2 — PARTIES

7. Plaintiff Luke Armondo Pence (also known as Lucas A. Pence) is an adult citizen of Tennessee, born August 26, 1983. He was a ward of the State of Tennessee from approximately 1992 to 2001. He currently resides in Madison, Tennessee.

8. Defendant Tennessee Department of Children's Services (DCS) is a state agency headquartered in Nashville, Tennessee. DCS was responsible for Plaintiff's removal, placement decisions, ongoing supervision, safety, education, records, and every aspect of his care during nine years of state custody. DCS employees and contractors acted at all times under color of state law.

9. Defendant Sumner County Department of Human Services is the regional DCS office that initiated Plaintiff's removal from his family home in Portland, Sumner County, Tennessee, filed the removal petition, and supervised the early stages of his custody.

10. Defendant Youth Opportunities of Tennessee, Inc. (YOITN) is a private corporation that operated Crockett Academy / Cumberland House under contract with DCS. YOITN acted jointly with the State and bears liability for the constitutional violations committed at that facility under Monell v. Department of Social Services, 436 U.S. 658 (1978).

11. Defendant Crockett Academy / Cumberland House is a youth residential treatment facility located in Nashville, Tennessee, at or near 3411 Belmont Boulevard, where Plaintiff was confined from approximately ages 9 to 12.

12. Defendant Middle Tennessee Mental Health Institute (MTMHI) is a state-operated psychiatric facility in Nashville, Tennessee, where Plaintiff was confined on multiple occasions as a minor and where staff used falsified records to label him a sexual-risk youth.

13. Defendant Tennessee Department of Mental Health and Substance Abuse Services (TDMHSAS) is the state agency that operated MTMHI and bears responsibility for the conditions, staffing, and conduct at that facility

14. Defendant Covenant Health / Peninsula Hospital Adolescent Program is a corporate healthcare entity operating an adolescent psychiatric program in Knoxville, Tennessee, where Plaintiff sustained a serious physical injury due to unsafe conditions. Covenant Health is a private corporation with substantial assets and bears direct liability for the negligence and constitutional violations committed at its facility.

15. Defendant Woodland Hills Youth Development Center is a secure state-operated juvenile facility in Nashville, Tennessee, where Plaintiff was inappropriately placed despite not meeting the adjudication criteria required for placement there.

16. Defendant Cedar Grove Residential Treatment Program is a youth residential treatment facility in Murfreesboro, Tennessee, near Lascassas Highway, where Plaintiff was placed twice — once in a mixed population including adjudicated sex offenders, and once in an exclusively male sex-offender unit, despite Plaintiff never having been adjudicated for any sexual offense.

17. Defendant DeDe Wallace Center is a youth residential and treatment facility in Madison, Tennessee, where Plaintiff was confined with a youth suffering a contagious skin condition and denied access to basic daily activities.

18. Defendants John Does 1-50 are unknown individual staff members at the above facilities whose identities will be established through discovery.

19. Defendants John Does 51-60 are unknown supervisors and administrators at the above facilities.

20. Defendants Jane Does 1-25 are unknown private contractors who provided services to DCS during Plaintiff's custody.

21. All Defendants acted under color of state law, jointly and severally, and are liable for the constitutional violations, negligence, and injuries described in this Complaint.

## PART 3 — JURISDICTION AND VENUE

22. This action arises under 42 U.S.C. § 1983, the Fourteenth Amendment, the Eighth Amendment, Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, and the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1412.

23. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4).

24. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a).

25. Venue is proper in the Middle District of Tennessee, Nashville Division, under 28 U.S.C. § 1391(b) because: (a) Plaintiff resided in Portland, Sumner County, Tennessee at the time of removal; (b) the wrongful removal proceedings occurred in Sumner County; (c) a substantial portion of the constitutional violations occurred in Davidson County, Tennessee; and (d) DCS, MTMHI, TDMHSAS, and Woodland Hills are headquartered or located in Nashville.

26. Plaintiff's claims are timely under multiple independent tolling doctrines: (a) minor tolling under Tenn. Code Ann. § 28-1-106, which tolled all claims until Plaintiff reached age 18; (b) the federal discovery rule, as Plaintiff only recently came to understand that the treatment he experienced constituted actionable legal violations rather than simply his normal experience

of childhood; (c) fraudulent concealment — Defendants destroyed records, falsified incident reports, and concealed misconduct, preventing Plaintiff from understanding the nature and extent of his claims; (d) continuing violation doctrine — the harm caused by Defendants' actions continued and compounded throughout Plaintiff's adulthood; and (e) mental incapacity tolling under Tenn. Code Ann. § 28-1-106, as Plaintiff has suffered from chronic PTSD, addiction, and depression directly caused by Defendants' conduct.

## PART 4 — FACTUAL ALLEGATIONS

### A. The Family That Was Taken

27. Plaintiff Luke Armondo Pence was born on August 26, 1983, to married parents in Portland, Sumner County, Tennessee. His parents were married at the time of his birth and raised Plaintiff and his three siblings together in an intact, loving household.

28. Plaintiff's father worked his entire adult life — from age seventeen until retirement — for the Public Works Division of Goodlettsville, Tennessee. Plaintiff's paternal grandfather, a Korean War veteran who lost an eye to shrapnel when a tank exploded near him in combat, also worked for and retired from the same department. These were men of stability, service, and commitment.

29. Plaintiff was the youngest of four children. His older brother was his best friend. His mother tucked him in at night. His father took him and his brother fishing, camping, and four-wheeling. The family had nicknames for each other. Plaintiff had toys, a dog, and a childhood.

30. Plaintiff's dog, Sweetie — a purebred American Pit Bull Terrier — was fiercely protective of Plaintiff and chose him above all others. When Sweetie had a litter of puppies, she would allow only Plaintiff near them. Plaintiff spent hours with her, loving her. She was his.

31. Plaintiff showed exceptional intellectual ability from an early age. At age nine, he tested in the gifted range with an IQ between 113 and 132. His parents bragged about it to family and friends. He had already decided he wanted to be an attorney when he grew up. He had already picked out his slogan: 'Luke Pence at your defense.'

32. This was the life the State of Tennessee destroyed.

**B. Wrongful Removal (Approximately 1992, Age 9)**

33. When Plaintiff was approximately nine years old, DCS removed him and his siblings from their family home based on allegations of neglect. There was no imminent danger, no substantiated abuse, and no legitimate legal basis for removal.

34. Plaintiff's mother had a speech disability — not a cognitive disability, not an intellectual impairment. DCS used her speech disability against her, treating her difficulty communicating as evidence of parental unfitness. The juvenile court provided no interpreter, no communication aid, and no ADA accommodation of any kind.

35. Without the ability to meaningfully participate in the proceedings against her, Plaintiff's mother could not defend herself, her home, or her children. The court signed the removal order.

36. The consequences were immediate and permanent. Plaintiff's parents divorced following the removal — his father, a man who had never touched alcohol in his life, began drinking in the

aftermath of losing his son. The drinking ended when the marriage ended, and his father never drank again — because it was never about alcohol. It was about unbearable loss.

37. Plaintiff's brother — his best friend — became a stranger. The distance between them has never closed. It never will. Plaintiff's relationship with his father, poisoned by years of separation and the trauma that followed, never fully recovered. His father died before they could find their way back to each other.

38. Plaintiff never saw Sweetie again.

## C. Crockett Academy / Cumberland House, Nashville (Approximately 1992-1995, Ages 9-12)

39. Shortly after removal, DCS placed Plaintiff at Crockett Academy / Cumberland House in Nashville, Tennessee, operated under state contract by Youth Opportunities of Tennessee, Inc. (YOITN).

40. Plaintiff was nine years old. The facility operated as a secure, locked residential treatment program with code-pad doors, quiet rooms, and 24-hour staff control over all movement — a level-2 or level-3 behavioral placement wholly inappropriate for a nine-year-old child who had not been adjudicated delinquent and came from a stable home.

41. Children at the facility were subjected to daily arms-out lineup drills — lining up shoulder-to-shoulder with arms extended, which the children privately referred to as the 'Hitler salute' simply to cope with the absurdity of the routine.

42. Plaintiff received no accredited education during his entire time at Crockett Academy. He attended only inconsistent on-site programming and earned zero transferable school credits despite his documented gifted-range intellectual ability.

43. During this placement, a staff member deliberately created a false conflict between Plaintiff and another boy. The staff member then locked both children together inside a quiet room — a small, isolated, secured space used for punitive confinement — and directed or coerced the boys into inappropriate physical contact under threat of further punishment.

44. After the incident, the same staff member falsified the official incident report, writing that he had 'caught them doing SS together' — a facility shorthand for sexual conduct — thereby concealing his own role, avoiding mandatory reporting requirements, and shifting blame onto two children who had been placed in the situation by an adult acting under color of state law.

45. No investigation was ever conducted. No mandatory abuse report was made. Both children were blamed equally. The false report was entered into Plaintiff's file and followed him through every subsequent placement, compounding the harm at every facility that received it.

46. A former employee of the facility, known to Plaintiff as 'Byod,' has come forward as a whistleblower and is expected to provide testimony corroborating the existence of the quiet-room incident and the staff misconduct surrounding it.

**D. Knoxville Treatment Campus — Peninsula / Covenant Health (Approximately 1995-1996)**

47. Plaintiff was transferred to an adolescent treatment campus in Knoxville, Tennessee, associated with Covenant Health / Peninsula Hospital and operated in connection with the same network that ran Crockett Academy.

48. The campus included multiple locked living wings, a central area featuring a basketball court prominently labeled 'VIP,' and a separate log-cabin structure used as a reward-based overnight placement for youth who accumulated enough behavioral points.

49. Plaintiff participated in the points system and saved enough to spend a night in the log cabin — a real house, a real bed, a couple who seemed like real parents, even if just for one night. The other children thought it was foolish to want it so badly. Plaintiff wanted it because he remembered what a real family felt like.

50. While at this facility, Plaintiff was assigned to sleep in a top bunk approximately six feet off the ground with no safety rail. While asleep, Plaintiff rolled off the bunk and fell to the concrete floor below, fracturing his collarbone.

51. After Plaintiff's injury, facility staff installed safety rails on the bunks. The installation of rails only after a child was injured constitutes an implicit admission that the prior configuration was a known or knowable hazard.

52. Plaintiff's mother was not promptly notified of the injury. She discovered it during a subsequent visit.

**E. MTMHI — False Labeling and Self-Harm (Approximately Age 13)**

53. At approximately age thirteen, Plaintiff was placed at Middle Tennessee Mental Health Institute (MTMHI) in Nashville, a state-operated psychiatric facility.

54. While at MTMHI, Plaintiff engaged in a minor, childish prank — touching another resident on the back to annoy a staff member. This was a common behavior among youth at the facility and had no sexual component or intent.

55. MTMHI staff retrieved the falsified Crockett Academy 'SS together' report — the fabricated document from a staff member's cover-up — and used it in combination with the minor prank to formally classify Plaintiff as a sexual-risk youth. Plaintiff had never been

adjudicated, charged, clinically evaluated, or found guilty of any sexual offense at any point in his life.

56. Based entirely on this false classification, Plaintiff was transferred to a residential facility housing adjudicated sex offenders. He was thirteen years old. He was not a sex offender. He was terrified.

57. Overwhelmed by fear, powerless, and without any advocate, Plaintiff broke a window and used the glass to cut his own wrists. Police officers responded with firearms drawn. One officer talked Plaintiff down.

58. No investigation into the false labeling was conducted. No one was held accountable. The transfer proceeded.

59. MTMHI later confirmed the following admission windows for Plaintiff: on or about late August 1998 through approximately mid-October 1999; on or about mid-December 1999; on or about late December 1999; and on or about late September 2000 through early October 2000. All clinical records from these admissions have been destroyed.

**F. Cedar Grove Residential Treatment Program, Murfreesboro — Two Placements**

60. Plaintiff was placed at Cedar Grove Residential Treatment Program near Lascassas Highway in Murfreesboro, Tennessee on two separate occasions.

61. The first placement occurred prior to the MTMHI false-labeling incident and was unrelated to any sexual-misconduct allegation. During this placement, Cedar Grove housed regular DCS wards alongside youth adjudicated for sexual offenses and, at times, female residents in connected programming. Plaintiff was a non-adjudicated child and had no basis to be housed in that environment.

62. The second placement at Cedar Grove occurred after the MTMHI false labeling. This time, Plaintiff was placed in a more restrictive, all-male unit housing exclusively youth with sexual-offense adjudications. DCS knowingly returned Plaintiff — a child who had already been traumatized in this environment, who had already attempted self-harm, and who had never been found guilty of any sexual offense — to an even more restrictive version of the same harmful placement. This was deliberate indifference.

**G. Woodland Hills Youth Development Center, Nashville**

63. At approximately age fourteen or fifteen, Plaintiff was placed at Woodland Hills Youth Development Center, a secure state-run juvenile facility in Nashville generally reserved for older youth who had been formally adjudicated delinquent for serious offenses.

64. Plaintiff did not meet the criteria for placement at Woodland Hills. He was housed with youth who had significantly more serious offense histories, increasing his exposure to violence, institutional trauma, and fear.

65. This placement further compounded and reinforced the harm caused by the false sexual-risk designation assigned at MTMHI, deepening Plaintiff's sense of powerlessness and misidentity.

**H. DeDe Wallace Center, Madison, Tennessee**

66. During a period following runaway episodes — during which Plaintiff sought refuge at his father's home in Madison, the only place that had ever felt safe — DCS placed Plaintiff at DeDe Wallace Center.

67. At DeDe Wallace, Plaintiff was housed in a room with a youth who had been diagnosed with scabies, a contagious skin infestation. Staff confined Plaintiff and two other boys to that

room for extended periods, including during mealtimes, citing fear of spreading the infection to the rest of the facility.

68. Staff had already exposed Plaintiff to the infected youth before implementing the confinement. Rather than providing proper quarantine protocols or medical care, they punished Plaintiff by locking him in the contaminated environment.

**I. Exploitation During Runaway Period**

69. During runaway episodes, Plaintiff sought his father and brother — not because he was a danger to anyone, but because they were his family and the State had no right to keep him from them.

70. While on the run at approximately age fourteen, Plaintiff was approached and manipulated by an adult male approximately nineteen to twenty years old who exploited Plaintiff's vulnerability, his institutional naivety, and his desperation. This adult used Plaintiff as an instrument in a personal dispute entirely unrelated to Plaintiff.

71. Plaintiff was subsequently charged with an offense despite being a minor acting under the influence and coercion of a predatory adult. This charge, and its consequences, are a direct result of DCS's repeated failure to provide Plaintiff with safe placements, stable supervision, education, and the basic foundation of a childhood.

**J. Release at Age 18 and Destruction of All Records**

72. When Plaintiff aged out of state custody at approximately age eighteen, the State of Tennessee released him onto the streets of Nashville with: no high school diploma; no GED; no transferable school credits; no job skills; no transition plan; no housing; no mental health referrals; and no support of any kind.

73. Plaintiff was immediately homeless.

74. In 2025, Plaintiff formally requested his complete DCS records, including placement lists, incident logs, caseworker notes, educational records, and medical files.

75. DCS Records Director Chuck Brown responded in writing that all of Plaintiff's records had been destroyed between approximately 2008 and 2010 when DCS transitioned to an electronic records system. Mr. Brown further stated that no placement lists, no facility-level records, and no documentation from Plaintiff's era existed.

76. MTMHI similarly confirmed that all clinical records pertaining to Plaintiff were destroyed, providing only admission and discharge date ranges.

77. The destruction of these records is not merely a records management failure. It is the final chapter of a pattern of concealment that began the day a staff member wrote 'caught them doing SS together' instead of the truth. Every facility that abused Plaintiff, every caseworker who ignored warning signs, every supervisor who looked away — all of it is now conveniently gone. The State destroyed the evidence of what it did to a child.

78. Under federal and Tennessee spoliation doctrine, this destruction creates a presumption that the destroyed records would have supported Plaintiff's claims. The State cannot benefit from its own concealment.

**K. Lifelong Harm**

79. As a direct and proximate result of Defendants' actions and omissions, Plaintiff has suffered and continues to suffer the following injuries, all of which are foreseeable consequences of the State's conduct:

80. Approximately fifteen or more years of heroin addiction, directly traceable to untreated childhood trauma and the absence of any mental health support upon release.

81. Chronic post-traumatic stress disorder, including persistent nightmares, hypervigilance, intrusive memories, and inability to feel safe.

82. Severe depression, recurring suicidal ideation, and multiple suicide attempts.

83. Complete inability to form and maintain healthy intimate relationships — a direct consequence of the State's systematic destruction of every attachment Plaintiff ever formed.

84. Social isolation, emotional detachment, and a profound sense of shame and worthlessness planted by years of being labeled, confined, and discarded.

85. Repeated incarceration as an adult, directly linked to untreated trauma, false labeling, lack of education, and the absence of any transition support.

86. Total loss of educational opportunity. Despite a gifted-range IQ, Plaintiff has no diploma, no credentials, and no pathway to the professional life he envisioned as a child.

87. Permanent destruction of his family. His parents divorced. His brother became a stranger. His father drank for the first time in his life and put it down when the marriage ended — because it was grief, not addiction. His father died before they could find their way back to each other. Plaintiff never got his father back. He never got his brother back. He never got his dog back. He never got his childhood back.

88. These are not abstract damages. These are the specific, documented, permanent consequences of the State of Tennessee removing a nine-year-old boy from a loving home and spending nine years breaking him.

## PART 5 — CAUSES OF ACTION

### COUNT I — 42 U.S.C. § 1983: Fourteenth Amendment — Substantive Due Process (Bodily Integrity and Liberty)

89. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

90. As a minor in the custody of the State of Tennessee, Plaintiff had a clearly established constitutional right to reasonable safety, freedom from state-enabled harm, and protection of his bodily integrity.

91. Defendants, acting under color of state law, violated those rights through: wrongful removal from a safe home; placement in age-inappropriate and dangerous facilities; staff-directed coercion in a locked isolation room; falsification of incident reports; placement with adjudicated offenders based on fabricated labels; physical injury from unsafe conditions; confinement with a contagious roommate; and total failure to provide education or transition support.

92. These actions shock the conscience and constitute substantive due process violations under the Fourteenth Amendment.

### COUNT II — 42 U.S.C. § 1983: Fourteenth Amendment — Procedural Due Process

93. Plaintiff incorporates all preceding paragraphs.

94. Plaintiff's mother was denied meaningful participation in the removal hearing due to Defendants' failure to provide ADA-required accommodations for her speech disability, violating Plaintiff's procedural due process rights.

95. Plaintiff was labeled a sexual-risk youth and transferred to sex-offender facilities without any hearing, adjudication, clinical evaluation, or procedural protection of any kind.

## COUNT III — 42 U.S.C. § 1983: Fourteenth Amendment — Equal Protection

96. Plaintiff incorporates all preceding paragraphs.

97. Plaintiff was subjected to discriminatory treatment through racially motivated peer pairing during the quiet-room incident, disproportionate blame assignment, and placement decisions based on fabricated behavioral profiles rather than legitimate individualized assessment.

## COUNT IV — 42 U.S.C. § 1983: State-Created Danger Doctrine

98. Plaintiff incorporates all preceding paragraphs.

99. Defendants affirmatively created and increased the danger to Plaintiff by: engineering the quiet-room incident; falsifying the resulting report; using that false report to manufacture a sexual-risk profile; transferring Plaintiff to sex-offender facilities based on that false profile; placing Plaintiff in Woodland Hills without adjudication; and creating the series of escalating placements that foreseeably produced Plaintiff's self-harm, criminal exposure, and lifelong trauma.

100. Plaintiff was placed in substantially greater danger by Defendants' affirmative acts than he would have faced had the State never intervened in his life.

## COUNT V — 42 U.S.C. § 1983: Deliberate Indifference to Safety (Eighth/Fourteenth Amendment)

101. Plaintiff incorporates all preceding paragraphs.

102. Defendants were deliberately indifferent to known and substantial risks of harm, including: the unsafe top bunk configuration that caused Plaintiff's collarbone fracture; dangerous peer pairings in isolation rooms; placement of a non-offending child with adjudicated sex offenders; confinement with a youth suffering a contagious condition; and retention of staff who fabricated incident reports.

## COUNT VI — Americans with Disabilities Act, Title II (42 U.S.C. § 12132)

103. Plaintiff incorporates all preceding paragraphs.

104. Defendants DCS and Sumner County DHS failed to provide reasonable accommodations for Plaintiff's mother's speech disability during removal proceedings, in violation of Title II of the ADA. This discrimination was a proximate cause of Plaintiff's wrongful removal and the nine years of harm that followed. See Tennessee v. Lane, 541 U.S. 509 (2004).

## COUNT VII — Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1412

105. Plaintiff incorporates all preceding paragraphs.

106. Despite Plaintiff's documented gifted-range intellectual ability, Defendants failed to provide him with a free appropriate public education during nine years of state custody, in violation of IDEA and its Tennessee counterparts. Plaintiff was released at age eighteen with no diploma, no credits, and no educational foundation.

## COUNT VIII — Negligence and Gross Negligence

107. Defendants owed Plaintiff a duty of care as a minor in their custody. Defendants breached that duty through every act and omission described herein. That breach directly and foreseeably caused Plaintiff's physical, psychological, educational, and economic injuries.

## COUNT IX — Negligent Supervision, Hiring, and Retention

108. Defendants employed, retained, and failed to supervise staff who fabricated incident reports, used coercive isolation practices, failed to report abuse, and created dangerous conditions for the children in their care. Defendants knew or should have known of this misconduct and failed to act.

## COUNT X — Failure to Protect

109. As a minor entirely dependent on Defendants for his safety, Plaintiff was owed an affirmative duty of protection. Defendants breached that duty at every facility described herein, in every placement decision described herein, and in every failure to investigate misconduct described herein.

## COUNT XI — Intentional Infliction of Emotional Distress

110. Defendants' conduct — including engineering a coercive incident in an isolation room, falsifying the report, labeling a thirteen-year-old a sex offender, and transferring him to sex-offender housing — was extreme, outrageous, and either intentional or recklessly indifferent to Plaintiff's psychological wellbeing. It caused profound and permanent emotional harm.

## COUNT XII — Spoliation / Destruction of Evidence

111. Defendants destroyed all placement logs, incident reports, clinical records, and educational files pertaining to Plaintiff's nine years in state custody. This destruction — confirmed in writing by DCS Records Director Chuck Brown — constitutes spoliation of evidence and entitles Plaintiff to adverse inference instructions at trial, monetary sanctions, and such other relief as the Court deems appropriate.

**COUNT XIII — Negligent Infliction of Emotional Distress**

112. Defendants' negligent conduct foreseeably caused Plaintiff lifelong psychological injury including PTSD, addiction, depression, suicidality, and social dysfunction.

**COUNT XIV — Monell Liability (Policy, Practice, and Custom)**

113. The violations described herein were not isolated incidents. They reflect the policies, practices, and customs of DCS and its contractors regarding: placement of young children in restrictive facilities; inadequate investigation of staff misconduct; failure to maintain and preserve records; failure to provide transition services; and systematic educational neglect of children in state custody. These policies and customs were the moving force behind Plaintiff's constitutional injuries.

## PART 6 — DAMAGES

114. Plaintiff incorporates all preceding paragraphs.

115. COMPENSATORY DAMAGES — PHYSICAL INJURY: Plaintiff suffered a fractured collarbone at Peninsula Hospital due to an unsafe bunk configuration. He suffered lacerations to his wrists during a self-harm episode caused by Defendants' false labeling and terrifying placement decisions. He is entitled to full compensation for these physical injuries and their lasting effects.

116. COMPENSATORY DAMAGES — PSYCHOLOGICAL AND EMOTIONAL HARM: Plaintiff has suffered chronic PTSD, severe depression, recurring suicidal ideation, multiple suicide attempts, social isolation, inability to form healthy relationships, persistent nightmares, and a profound, permanent disruption of his sense of self and safety. These

injuries are directly and proximately caused by Defendants' conduct and require ongoing treatment.

117. COMPENSATORY DAMAGES — LOSS OF FAMILY: The wrongful removal of Plaintiff from his family caused the divorce of his parents, the estrangement of his brother, the permanent severing of the family bond that existed before 1992, and the death of his father before reconciliation was possible. The loss of family is its own category of compensable damage, distinct from emotional distress, and reflects the full scope of what the State stole.

118. COMPENSATORY DAMAGES — EDUCATIONAL DEPRIVATION AND LOST EARNING CAPACITY: Despite a gifted-range IQ and documented intellectual potential, Plaintiff was released from nine years of state custody without a diploma, without credentials, and without the foundational education that would have enabled him to pursue the professional future he had envisioned as a child. The economic losses from this deprivation span a lifetime.

119. COMPENSATORY DAMAGES — DESTRUCTION OF RECORDS: The destruction of Plaintiff's records caused independent harm by eliminating his ability to access his own history, understand his medical and psychiatric background, challenge the false labels assigned to him, and present documentary evidence in these proceedings.

120. PUNITIVE DAMAGES: Defendants' conduct was reckless, malicious, and deliberately indifferent to the constitutional rights of a child in their care. Staff fabricated incident reports. Supervisors concealed misconduct. Agencies destroyed evidence. Contractors placed a nine-year-old in a facility designed for dangerous teenagers. Punitive damages are warranted and necessary to punish this conduct and deter its repetition.

121. ATTORNEY'S FEES AND COSTS: Plaintiff seeks attorney's fees under 42 U.S.C. § 1988 and all costs of litigation.

122. TOTAL DAMAGES: Plaintiff seeks total damages — compensatory and punitive — of $75,000,000. This figure reflects nine years of institutionalized abuse, thirty years of documented aftermath, the complete destruction of a family, the theft of an education and a career, and the lifelong cost of what the State of Tennessee did to a nine-year-old boy it had no legitimate reason to take.

123. Plaintiff will not accept a nominal settlement. He seeks a full accounting, a public record, and a verdict.

## PART 7 — PRAYER FOR RELIEF

WHEREFORE, Plaintiff Luke Armondo Pence respectfully requests that this Court:

A. Enter judgment in Plaintiff's favor on all counts;

B. Award compensatory damages in an amount to be determined at trial, not less than $75,000,000;

C. Award punitive damages against individual Defendants for reckless, malicious, and deliberate misconduct;

D. Award attorney's fees and costs under 42 U.S.C. § 1988;

E. Issue a declaration that Defendants violated Plaintiff's rights under the United States Constitution, the ADA, and IDEA;

F.  Issue an injunction requiring Defendants to preserve all remaining records, disclose all surviving documentation related to Plaintiff's custody, and identify all staff involved in the incidents described herein;

G.  Order appropriate equitable relief including correction and expungement of any surviving false behavioral labels in Plaintiff's records;

H.  Grant any further relief this Court deems just, proper, and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable. Plaintiff does not seek early settlement and is prepared to try this case before a jury of his peers.

## REQUEST FOR APPOINTMENT OF COUNSEL

Plaintiff respectfully requests appointment of counsel pursuant to 28 U.S.C. § 1915(e). This case involves complex constitutional claims across multiple state agencies and private contractors spanning nine years, requires discovery into destroyed records, and involves expert testimony on psychological harm and educational deprivation. Plaintiff is indigent and cannot litigate this case alone. The interests of justice require appointment of counsel.

## SIGNATURE

Respectfully submitted,

**Luke Armondo Pence, also known as Lucas A. Pence**

Plaintiff, Pro Se

Address: 313 Idlewild Ave, Madison, TN 37115

Phone: (615)243-9458

Email: Johnsonluke176@gmail.com

Date: 03/20/26